# EXHIBIT 1

1          UNITED STATES DISTRICT COURT

2      WESTERN DISTRICT OF WASHINGTON AT SEATTLE

3    ─────────────────────────────────────────────

4

5    BRENDAN DUNN, JACOB ERWIN, and     )
     RYAN TOMPKINS,                     )
6                                       )
                     Plaintiffs,        )
7                                       )
                                        ) No. C08-0978 JLR
8    vs.                                )
                                        )
9                                       )
     MATTHEW HYRA, et al.,              )
10                                      )
                     Defendants.        )
11

12

13   ─────────────────────────────────────────────

14       DEPOSITION UPON ORAL EXAMINATION

15                     OF

16          DETECTIVE MATTHEW HYRA

17   ─────────────────────────────────────────────

18

19               10:00 a.m.
                July 13, 2009
20        601 Union Street, Suite 3100
               Seattle, Washington
21

22          CARRIE L. PUMNEA, CCR
23        NORTHWEST COURT REPORTERS
        1415 Second Avenue, Suite 1107
24        Seattle, Washington  98101
               206.623.6136
25       www.northwestcourtreporters.com

1    boundaries were basically that of the East Precinct.  We

2    traveled wherever it was that we were needed.

3        Q.   Okay.  You said you maintained that assignment,

4    or at least the East Precinct bike squad, until September

5    of '07.

6             No, I take that back.  You said that in between

7    you requested to return to patrol.

8        A.   I did.

9        Q.   Why did you make that request?

10       A.   Much of the decision was based off of this

11   particular incident that we're talking about.

12       Q.   How do you mean?

13       A.   The protest.

14       Q.   No, I understand.  How do you mean much of the

15   decision was based on that?

16       A.   If there were two or three times on the job

17   where I was actually in fear for my life, that was one of

18   them.

19       Q.   Okay.  So you requested a return back to patrol?

20       A.   I did.

21       Q.   We'll come back to that.

22            Were there other times you were in fear for your

23   life while you were assigned to the East Precinct bicycle

24   squad?

25       A.   One other time I can recall.

Detective Matthew Hyra - July 13, 2009

1       A.   Not during my interaction with it.

2       Q.   And you approached them, correct?  You initiated

3   the contact?

4       A.   That is correct.

5            MS. CARR:  Object to the form.  Vague.

6       Q.   What was your assignment on that day, October

7   5th, 2006?

8       A.   I was assigned to the bike squad to monitor the

9   protest to make sure that everything was in control, no

10  violence broke out and that the protest could proceed.

11      Q.   Who was your immediate supervisor?

12      A.   Sergeant Ann Martin.

13      Q.   And she was on scene, correct?

14      A.   She was.

15           MS. CARR:  Object to the form.  Vague as to time

16  frame.

17      Q.   Before you approached the plaintiffs and the

18  group that they were among, what was her position

19  physically, geographically?

20           MS. CARR:  Sorry, could you please just read the

21  question back for me.

22                (Court reporter read back last question.)

23           MS. CARR:  Object to the form.  Calls for

24  speculation.  Foundation.

25      Q.   To your knowledge -- well, in your report you

Detective Matthew Hyra - July 13, 2009

1        MS. CARR:  Object to the form.  Foundation.

2     Q.   To your knowledge.

3     A.   Lieutenant Hayes' location was somewhere in the

4  park, but I don't know precisely where he was.  My

5  conversation with him took place via phone.

6     Q.   When did that take place?

7     A.   Immediately after speaking with Sergeant Martin.

8     Q.   So the three of you did not have the

9  conversation together?

10     A.   We did not.

11     Q.   What was the nature of your conversation with

12  Sergeant Martin?

13     A.   My recollection is that I was approached by Kay

14  Rood, who expressed concern over a group proclaiming to be

15  anarchists that were going to engage in criminal activity

16  during the demonstration, and I brought that information

17  up to Sergeant Martin.

18     Q.   Did Ms. Rood approach you, did you approach her?

19     A.   I believe it was Kay Rood who approached me as I

20  was standing on the side of the park.

21     Q.   Okay.  Do you know of any reason she approached

22  you in particular?

23     A.   Ms. Rood and I have had a professional

24  relationship for approximately two, two and a half years

25  prior to that.

Detective Matthew Hyra - July 13, 2009

Page 56

1   march downtown from Cal Anderson Park independently of the

2   main demonstration?

3           MS. CARR:  Sorry, could you read the question

4   back.

5                   (Court reporter read back last question.)

6      A.   Not to my knowledge.  I don't know what happened

7   as far as the demonstration goes.

8      Q.   Do you have any specific knowledge as to what

9   the individuals who you contacted intended to do?

10          MS. CARR:  Object to the form.  Vague.

11     A.   I'm not sure that I necessarily understand the

12  question.

13     Q.   Do you have any specific knowledge as to what

14  the group of people who you approached, including the

15  plaintiffs, actually intended to do during this

16  demonstration?

17     A.   My intent was to gather that information by

18  initiating a social contact with them; however, I was

19  unable to ascertain that due to the fact that they

20  surrounded and assaulted me.

21     Q.   You initiated the contact by taking their flag,

22  didn't you?

23     A.   I initiated the contact by touching Mr. Erwin's

24  shoulder and taking a metal pole out of his grasp.

25     Q.   Metal pole that was attached to a flag?

Detective Matthew Hyra - July 13, 2009

1    vague question and a vague response?

2       Q.   Now, I'm going to go back to the same question

3    that I've been trying to get an answer to for the last 20

4    minutes.

5            What reason, if any, do you have to believe that

6    Mr. Erwin would want to have a social contact with you

7    when the first contact he has with you is you coming

8    around from over his shoulder and taking his flag and

9    flagpole away?  What reason do you have, based on your

10   training and experience, to believe that he would want to

11   have a friendly conversation with you after that?

12           MS. CARR:  Object to the form.  Compound.  Calls

13   for speculation.  Lack of foundation.

14       Q.   You may answer the question.

15           MS. CARR:  Argumentative.

16       A.   I have conducted, I can safely say, thousands of

17   social contacts, and in the course of conducting those

18   social contacts I have removed golf clubs from people's

19   possessions, baseball bats from people's possession, an

20   open knife from people's possession, and still were able

21   to maintain a civil conversation with the individuals I

22   was contacting.

23           In the case of Mr. Erwin, I looked at the pole

24   as being a potential officer safety hazard.  And in the

25   same context as I've contacted literally thousands of

Detective Matthew Hyra - July 13, 2009

Page 86

1    as being potentially hostile or violent during protests?

2        A.    Nothing comes to mind at this particular moment.

3        MS. CARR:   Really?  I mean, I was thinking all

4    sorts of stuff.  That has nothing to do with it.  Just

5    stay with whatever your answer is.

6        A.    I mean, there's been other groups that have been

7    involved in violence during protests, but specifically

8    what they're affiliated with...

9        Q.    So you know of an individual who told you that

10   seven years prior she had had a bad experience with

11   anarchists at a demonstration, tell you that she had read

12   a posting that said that anarchists might do many fun

13   things?

14       MS. CARR:   Object to the form, if that's a

15   question.

16       A.    The whole basis of this is that Kay Rood came up

17   to me and informed me that she had obtained information

18   that a group of anarchists might engage in some type of

19   violent or disruptive behavior that could jeopardize

20   personal safety or property damage.

21       Now, based off of what she said, that was the

22   information I had at the time, and based off of what she

23   said, I informed the incident commander and my supervisor,

24   and so we looked for individuals who matched the

25   description that Kay Rood had given me.

Detective Matthew Hyra - July 13, 2009

Page 89

1    Q.   And you think it may have been given to Sergeant

2  Martin by Ms. Rood herself, or do you think you gave it to

3  Sergeant Martin?

4    A.   I'm certain I spoke to Sergeant Martin.

5    Q.   You're not certain as to whether or not Ms. Rood

6  was there?

7    A.   Ms. Rood was adjacent, and I know at some point

8  in time they were introduced to each other.

9    Q.   Okay.  But you don't know the nature of any of

10  the conversation they had, or do you?

11    A.   No, not intimately.

12    Q.   How about generally?

13    A.   It may have been just a situation where they met

14  each other and exchanged names and possibly some

15  information.

16    Q.   Did Sergeant Martin give you any instructions or

17  advice about how to proceed?

18    A.   Both Sergeant Martin and Lieutenant Hayes during

19  those conversations, during that time, and I believe it

20  was Lieutenant Hayes who -- he was the incident commander,

21  he made the determination that based off the information

22  that Kay Rood had given, right, that we, if we could,

23  identify any groups that were potentially associated with

24  the anarchists, that it would do -- to have a social

25  contact to identify them, say, "Hey, do you guys know of

Detective Matthew Hyra - July 13, 2009

Page 90

1  anything that's going on, do you guys have any plans of

2  doing anything," and see if we could obtain more

3  information that way.  And sometimes just initiating the

4  social contact, as I had stated before, is enough to deter

5  criminal behavior.

6          And based off of what Kay Rood said, stipulating

7  that she believed anarchists were involved with that,

8  that's why we went through the crowd trying to see whether

9  or not we could find anybody associated with that

10 particular group.  It had nothing to do with political

11 affiliation, it had everything to do with the potential

12 for violence based off the information that Ms. Rood had

13 given us.

14 Q.    Except that group is identified specifically and

15 only based on political views and affiliation, right?

16 A.    Based off of political views and -- the contact

17 was associated, based on my training and experience, that

18 they were in possession of a flag that identified them as

19 anarchists.  Based off the information that Kay Rood had

20 given me, stipulating that anarchists could potentially be

21 involved in violence at the protest, that's why they were

22 contacted.

23         If Kay Rood had said a group of people wearing

24 Minnie Mouse hats were in the protest and they were

25 planning on engaging in disruptive or violent behavior, I

Page 116

1     A.   Pursuant to our discussions, yeah.

2     Q.   Did they give you any cautions about making the

3  contact with individuals you perceived to be anarchists?

4     A.   The same caution as usual, be safe.

5     Q.   Whose idea was that if they had flags you should

6  take the flag -- if they had flags on poles that you

7  should take the flags away?

8          MS. CARR:  Object to the form.  Assumes facts.

9     Q.   Where did that idea come from?

10    A.   I did not take the flag as I took the pole,

11  which was presenting an officer safety hazard.  Had the

12  flag been on the ground or away from that particular area,

13  I would not have taken the flag.  I would not have touched

14  it, unless it was attached to a weapon that could be used

15  against me.

16    Q.   What would have happened in your judgment --

17  well, okay.

18          First of all, what reason do you have to believe

19  that Mr. Erwin had any intention of using that flag and

20  pole as a weapon against you?

21    A.   Pursuant to my conversation with Ms. Rood, who

22  informed me that she had come by information stipulating

23  that a group of people associated with anarchists were

24  planning on engaging in some type of violent or

25  destructive behavior.  That was the information I had

Detective Matthew Hyra - July 13, 2009

Page 119

1   report I think some other individuals are named.

2           But, Mr. Hildes, I was being assailed from the

3   rear, from the front, and from both sides, and someone was

4   trying to get my sidearm out of its holster.  I did not

5   take the time to accurately visually identify every person

6   that was assailing me.

7       Q.   Did you see this person who was supposedly

8   trying to take your sidearm?

9       A.   My head was down at the time and I was getting

10  punched to the right side of my head as somebody was

11  trying to lift my weapon out of my holster.

12      Q.   So in other words, no, you never saw this

13  person?

14      A.   That's correct.

15      Q.   What did you do when someone supposedly tried to

16  lift your gun out of its holster?

17      A.   Had I been able to put my hand on the butt of my

18  weapon, that is what I would have done.  I was unable to

19  do that.

20      Q.   What's your training as to what you're supposed

21  to do if somebody tries to take your weapon?

22      A.   If you're able to put your hand on the butt of

23  the weapon and to create distance from the person who is

24  attempting to remove the weapon from its holster.

25      Q.   Anything else?

Page 126

1    A.    No.

2    Q.    And that only changed after you took the flag

3  and flagpole, correct, and then they got upset, according

4  to you?

5          MS. CARR:  Object to the form.  Vague.

6    Q.    You may answer the question.

7          MS. CARR:  I might withdraw it, if you can read

8  me the question back.

9          MR. HILDES:  Go ahead.

10         MS. CARR:  I'm sorry.  I don't want to make an

11 improper objection, I just may have misheard it.

12              (Court reporter read back last question.)

13         MS. CARR:  Same objection.

14   A.    Seconds after I attempted to initiate the social

15 contact with Mr. Erwin, I was pelted with expletives,

16 surrounded, yelled at, even though I told them I had every

17 intention of giving them the flag and the flagpole.  I

18 told them, and I never got to a position where I was able

19 to do that because of the threat of my own personal

20 safety.

21   Q.    Do you know of any reason they would have to

22 believe you that after you took the flag and flagpole that

23 you intended to give it back?

24         MS. CARR:  Object to the form.  Calls for

25 speculation.

Detective Matthew Hyra - July 13, 2009

1    Q.   Okay.  How long was it?

2    A.   I can't recall.

3    Q.   How long did it bleed?

4    A.   I think the bleeding stopped by the time I got

5  to the precinct.

6    Q.   How did you cut your hand?

7    A.   I don't recall how it got cut.

8    Q.   Do you have any reason to believe that Mr. Dunn

9  cut your hand?

10    A.   Mr. Dunn was hanging off of my back during the

11  incident, so I don't see how he could have reached across

12  and gotten ahold of my left hand.

13    Q.   How do you know that Mr. Dunn was hanging off of

14  your back?  Did you ever see him?

15    A.   I was informed that -- I believe it was Officer

16  Skommesa who had removed Subject Dunn from my back, if I

17  recall correctly.  I can refer to my report.

18    Q.   But you have no personal knowledge?  You only

19  know that from Officer Skommesa telling you that?

20    A.   I don't have the ability to look behind me.

21    Q.   But you know someone was back there?

22    A.   Somebody was.

23    Q.   Did you ever see Mr. Dunn prior to his being

24  taken to the precinct?

25    A.   I saw him in the park as he was being arrested,

Detective Matthew Hyra - July 13, 2009

Page 158

1           MR. HILDES:  No.  You're correct.  Thank you.

2      Q.   In any of those reports, do you see anywhere

3  where you mentioned Tompkins kicking your bicycle, or

4  anything else for that matter?

5      A.   The word I used in my report is that he

6  intentionally walked into my bike.  He blocked my path

7  from walking my bike.

8      Q.   Walking is different from kicking, isn't it?

9      A.   I would agree with that statement.

10      Q.   Okay.  So you have -- let's go back to where we

11  were.

12           You have -- so Mr. Erwin is to your right, you

13  have the flag and pole, you're walking, he's walking with

14  you.  At that moment, where is Mr. Tompkins?

15      A.   At that particular moment, Mr. Tompkins is in

16  front of me.

17      Q.   How far?

18      A.   No more than 12 inches away from the front of my

19  bike, I think, at any given time.

20      Q.   Was he stationary or moving?

21      A.   He would move until I came up to him where I had

22  to stop and I couldn't proceed any further, so -- and then

23  I would ask him to move again.  I think I say it in my

24  report that I talked to him three times to stop blocking

25  my path or I'll be forced to put him into custody for --

1    if you block my path or strike -- stop obstructing me no

2    less than three times, stating move out of my way, if you

3    block my path or strike me on my bike, I will place you

4    under arrest for obstructing.  After the third such order,

5    Mr. Tompkins intentionally walked into my bike, striking

6    it with his legs and failed to move.

7        Q.   So you didn't strike his legs with your bike, he

8    struck your bike with his legs?  Is that your testimony

9    under oath?

10            MS. CARR:  Object to the form.  One,

11   argumentative; two, testimony speaks for itself.

12       Q.   That's your testimony?

13       A.   He walked directly into my bike, yes.

14       Q.   What was he doing with his hands during this

15   period?

16       A.   I believe he had a camera in them.

17       Q.   So he was taking pictures of you.

18            MS. CARR:  Object to the form, if that's a

19   question.  Calls for speculation.

20       Q.   Is that correct?

21       A.   You would have to ask Mr. Tompkins.

22       Q.   Did he appear to be taking pictures?

23       A.   He appeared that way, yes.

24       Q.   And then backed up and took another picture; is

25   that correct?

Detective Matthew Hyra - July 13, 2009

1    A.   I'm not sure how many times he backed up and

2  stopped.

3    Q.   Was he directly in front of you or to the side?

4    A.   He was directly in front of me, impeding my

5  ability to escape a mob that had surrounded me.

6    Q.   What was this mob doing at the point where

7  Mr. Tompkins appears to be taking pictures of you from in

8  front of you?

9    A.   What Mr. Tompkins was doing was blocking my

10  path, and what the individuals around me were doing were

11  yelling and screaming at the top of their lungs and they

12  were beginning to put black bandannas on their face and

13  scarves on their face, which I took to be a sign that an

14  imminent assault on my person was going to take place and

15  they were using the scarves to conceal their identity.

16    Q.   Is that consistent with your training?

17        MS. CARR:  Object to the form.  Vague.

18    A.   It's objective with my experience in law

19  enforcement that people who are about to commit a crime

20  and want to conceal their identity will cover their faces.

21    Q.   Have you been at other demonstrations where

22  groups of people covered their faces with bandannas and

23  then assaulted officers?

24    A.   I have been in demonstrations where groups of

25  individuals have covered their faces and thrown

Detective Matthew Hyra - July 13, 2009

Page 175

1    you'd give the witness a little bit more time to review

2    the documents before moving on to a question about what

3    the documents may or may not say.  I'd ask that you would

4    do that so that the officer has the opportunity to review

5    before answering.

6         MR. HILDES:  Feel free.

7         MS. CARR:  I don't mean all of them right now in

8    the forecast of what you might be asking in the future.  I

9    mean, when you ask him a specific question about what a

10   report does or does not say, if you could allow him the

11   opportunity to review the report at that time to respond,

12   that may be our best attempt to get this done in a clean

13   and concise manner.

14        MR. HILDES:  Fair enough.

15        Q.    So you were attempting to leave the park with

16   the flag?

17        A.    After telling Mr. Erwin repeatedly that once I

18   got to a safe location I would return it to him, I wasn't

19   going to give it to him at that particular time because I

20   wasn't able to go forward, I couldn't go left, I couldn't

21   go right, I was completely surrounded.  By giving him a

22   pole, I might as well have been giving him something to

23   stab or strike him with.

24        Q.    Mr. Erwin never stabbed or struck you with

25   anything, including his own hands, did he?

Detective Matthew Hyra - July 13, 2009

Page 214

1      A.    I pursued Mr. Tompkins, correct.

2      Q.    Through a crowd of people who were so close that

3  they were touching you, by your previous testimony, and

4  that their numbers and location held your bicycle up.   How

5  did you do that?

6           MS. CARR:   Object to the form.   Argumentive.

7      Q.    How did you get them out of your way?

8      A.    I followed Mr. Tompkins.   Mr. Tompkins had kind

9  of cut a path through the crowd, which I then pursued him

10 through, and grabbed ahold of him.   Mr. Tompkins did not

11 get farther than a few feet.

12     Q.    How few?

13     A.    To be safe, I'll estimate six feet.

14     Q.    So you've got from two to an estimated six feet

15 cutting a path through the crowd.

16          MS. CARR:   Object to the form.

17     Q.    Is that accurate?

18          MS. CARR:   Object to the form.   Argumentative.

19 Mischaracterizes testimony.

20     A.    As far as I can be accurate based on the time

21 between the incident and today, that's as close of an

22 estimate I'm going to get.   Maybe two to six feet.

23     Q.    How did Mr. Tompkins cut a path two to six feet

24 through the crowd?

25          MS. CARR:   Object to the form.

Page 217

1   attempting to wrench it out of my hand and by doing so had

2   bent the pole.

3         So by the time this whole thing was over and

4   done with, because I never released the pole because I

5   felt certain if the pole had been taken away from my grasp

6   that it was going to be used against me either in a

7   stabbing or striking fashion, at the end of that, after

8   everything had settled down and I was more or less rescued

9   by backing officers, the pole was quite twisted.  It was

10  quite twisted and bent.

11       Q.   So clearly it wasn't so strong that several

12  people pulling on it couldn't severely twist it and bend

13  it, right?

14            MS. CARR:  Object to the form.

15       A.   It was strong enough not to break but still

16  presented a clear safety hazard.

17       Q.   So you're holding onto the pole, which is being

18  tugged so severely it severely twisted and bent with the

19  same hand, in the other hand you're holding onto

20  Mr. Tompkins, people are supposedly holding onto you,

21  they're holding onto him.  How did you do that?  How is it

22  physically possible to have maintained control over

23  Mr. Tompkins while all this is happening?

24            MS. CARR:  Object to the form.

25       A.   I will say this:  The fact that I did not get



**SEATTLE POLICE DEPARTMENT**

**STATEMENT FORM**

INCIDENT NUMBER
06-422062

UNIT FILE NUMBER

| DATE | TIME | PLACE |
|---|---|---|
| 10/5/2006 | 1733 | 1519 12 Ave |

STATEMENT OF ☐ COMPLAINANT ☐ WITNESS ☐ VICTIM ☒ OFFICER ☐ OTHER

NAME (LAST FIRST MI): M Hyra 6620                    DOB

On the date of 10-05-06 at 1300 hrs I was working in uniform with my partner, Officer Bale, assigned to bike patrol unit designated 2G82. At that time I was assigned as a bike patrol unit monitoring a large crowd at Cal Anderson Park associated with the World Can't Wait and the Revolutionary Communist Party anti-war movement. My orders governing this event were to ensure event stabilization and that life safety issues were addressed, as needed. I was working with my partner, Officer Bale.

During this event, I was informed that a group of Anarchists were planning to infiltrate the crowd, brake into a splinter group and disrupt the rally. This information came by way of C/Rood, a member of the board of the Friends of Cal Anderson Park who was concerned that the group might incite violence. S/Rood stated that she had come by this information by way of a posting on the Internet, a common media used by Anarchists. In addition, C/Rood stated that she understood the Anarchists would rally like-minded individuals by a signaling them by way of black flags associated with anarchists. I, through training and experience, am well versed with such flags as well as the Anarchist movement and their behavior in such gatherings as it relates to violence. I have personally contacted members of this organization during previous protests and have a thorough understanding of their operations, methods of communication and their history of violence and property destruction. It is also my experience that such flags are used for signaling criminal activity, such as property destruction or group movement to block freeways, as well as weapons as most flags are secured to metal pipes or heavy wooden dowels. Additionally, information relating to flag use and Anarchists has regularly be disseminated during briefing prior to protests in which Anarchists are expected. I informed my supervisor, Sgt. Martin, of the information I had received as well as Lt. Hayes, the incident commander. During this conversation it was determined that suspected Anarchist groups would be contacted and, if in possession of such flags, investigation would commence to determine the flags intended use. The purpose of such investigations would be centered on life safety issues and to ensure incident stabilization of the event.

A few minutes later I happened across a group of approximately 15 to 20 subjects in the middle of Cal Anderson Park. A subject, later identified as S/Erwin, was in possession of an Anarchist flag displaying the colors of black and red. I have seen the exact flag pattern in the past and know, from experience, that Anarchists use this type of flag. In addition, I noted that several of the subjects with S/Erwin were in possession of Anarchist flyers, each displaying a large 'A', the symbol of the organization. I contacted S/Erwin as the flag was attached to a metal pole and presented an officer safety hazard due to the fact that it could be used as a weapon. I removed the pole from his possession. It is a common practice to secure obvious weapons or tools that could be used as such during field contacts. I then attempted to speak S/Erwin about the flag, separate from the group. During this conversation, S/Erwin stated that the flag 'was not his'. I then inquired as to who owned the flag. No one in the group initially answered, but some later stated it belonged to a subject who was not present in the group. Other subjects, not present during my initial observations of S/Erwin, then claimed the flag as theirs. S/Erwin then stated that he wanted the flag back. I told him that I would return the flag to him, but I needed to speak with him with regard to the flag and his intentions on its use. As I was speaking to S/Erwin, approximately 15 to 20 subjects, all yelling at me, and my partner Officer Bale, rapidly surrounded me with the closest being within three feet of me. As the situation rapidly deteriorated, several of the group

WITNESS

WITNESS

TRANSCRIBED BY (Taped / Translated Statements)

STATEMENT TAKEN BY: M Hyra                    X ~~~~

| STATEMENT TAKEN BY | | SERIAL | UNIT |
|---|---|---|---|
| M Hyra | | 6620 | 662 |
| | SERIAL | UNIT | |
| SUPERVISOR | | SERIAL | |

EXHIBIT
4

ENGAD 800-631-6989

PAGE 1 OF 3

DEF ID 6



**SEATTLE
POLICE
DEPARTMENT**

**STATEMENT FORM**

| INCIDENT NUMBER |
| --- |
| 06-422062 |
| UNIT FILE NUMBER |

| DATE | TIME | PLACE |
| --- | --- | --- |
| 10/5/2006 | 1733 | 1519 12 Ave |

| STATEMENT OF | COMPLAINANT   WITNESS | VICTIM   OFFICER   OTHER | | |
| --- | --- | --- | --- | --- |
| NAME (LAST FIRST MI) | | | | DOB |
| M Hyra 6620 | | | | |

acknowledged that they were 'Anarchists' and demanded to have me return the flag to S/Erwin, as well as identify myself. I verbally identified myself, by name and serial number, and stated, plainly, that I had every intention of returning the flag to S/Erwin, but would not address the group as a whole. This decision was due to the ever increasing threat to my safety as the group was adopting a 'mob' mentality. The crowd subsequently grew more hostile as well as grew in numbers. I then decided to depart the area, as my safety was a great concern, but still told S/Erwin that I would return the flag to him. I was unable to mount my bicycle, as the group was in physical contact with me, and began to walk east.

As I was attempting to leave the park to the east, the nearest route out of the park, the group followed and several subjects approached me in a threatening manner. One subject, later identified as S/Tompkins, was actively blocking my path. I was unable to turn either left or right as I was completely surrounded. I told S/Tompkins to stop obstructing me no less than three times, clearly stating 'move out of my way. If you block my path or strike me or my bike, I will place you under arrest for obstructing'. After the third order, S/Tompkins intentionally walked into my bike, striking it with his legs, while calling me 'asshole'. At this point the crowd became even more hostile and gathered in closer while donning black scarves and ski masks to conceal their identity. I recognized this behavior, from training and experience, as a precursor to criminal activity. I then instructed S/Tompkins he was under arrest for Obstructing and attempted to place him into custody.

As I attempted to place S/Tompkins into custody, S/Tompkins ran back from me. I then pursued S/Tompkins and was able to take control of his right and left arms. S/Tompkins actively attempted to pull away from me and I was quickly surrounded by other members of the Anarchist group, several with ski masks or scarves concealing their faces. During this stage of the event, I had several people attempting to pull me off of S/Tompkins as well as several people attempting to pull S/Tompkins from my grasp; one of these subjects was identified as S/Erwin. I had one subject, later identified as S/Dunn, grab me from the rear and attempt to place his arm around my neck as well as push me and attempt to pull me off S/Tompkins. I also had several people attempt to pull the metal flag pole from my grasp, which I feared would be used against me as a weapon. Additionally, subjects were attempting to remove my hand gun from its holster. This struggle continued with S/Tompkins actively resisting and me sustaining several assaults from various individuals until back up arrived. During this stage of the event over 40 subjects surrounded me, and Officer Bale, and I believed, sincerely, that I was in grave danger. Once other Officers arrived, being Officers Skommesa, Greeley, Avery, Roberson and Sgt. Martin, I was able to place S/Tompkins into custody. Officer Skommesa took S/Dunn, who had assaulted me from the rear, into custody. Officer Roberson took S/Erwin, who had actively attempted to pull S/Tompkins from my grasp, into custody.  Several other suspects, whom I know to have struck me or attempted to remove my weapon, fled into the crowd to evade police contact. Pursuit of these subjects could not be initiated due to the number of hostile subjects present and the size of the crowd.

I sustained a laceration to my left hand and pain to my left Achilles heel as a result of struggle.

| WITNESS | | | | |
| --- | --- | --- | --- | --- |
| | X   M Hyra | | | |
| WITNESS | STATEMENT TAKEN BY | | SERIAL | UNIT |
| | M Hyra | | 6620 | 662 |
| TRANSCRIBED BY (Taped / Translated Statements) | SERIAL | UNIT | SUPERVISOR | SERIAL |

Form 417  CS 21.67  Rev (2-97)

DEF ID 7



**SEATTLE POLICE DEPARTMENT**

## STATEMENT FORM

INCIDENT NUMBER
06-422062

UNIT FILE NUMBER

| DATE | TIME | PLACE |
|------|------|-------|
| 10/5/2006 | 1733 | 1519 12 Ave |

STATEMENT OF    COMPLAINANT   WITNESS          VICTIM   OFFICER OTHER

| NAME (LAST FIRST MI) | DOB |
|---|---|
| M Hyra 6620 | |

I arranged transport for all three suspects to the East Precinct and turned the flag in question over to Officer Bale for evidence processing. Once I arrived at the East Precinct I made an Internet inquiry with regard to the posting C/Rood had informed me about. I found it compatible and in line with what C/Rood had referenced. The posting also made reference to the WTO riots, an event in which the Anarchists figured prominently as instigators of violence and property destruction. I printed a copy of this posting and included it with the Incident Report.

I then met with each suspect and issued each their Miranda advisement from the back of my SPD issued MIR card. S/Tompkins and S/Erwin stated that they understood their rights as I had read them by saying 'yes' when asked. S/Dunn did not verbally respond, but nodded his head in the affirmative.

During post Miranda questioning, S/Tompkins readily admitted that he was associated with Anarchists and that the flag was an Anarchist flag. I then fully explained to S/Tompkins why he was in custody, specifically noting that I had every intention of returning the flag to S/Erwin, and asked him why he had struck my bike. S/Tompkins stated that I 'ran into' him and also acknowledged that I had, in fact, stated that I would return the flag. I then inquired as to why he felt the need to escalate matters into an arrest situation. S/Tompkins did not reply. I then informed him that during the struggle someone had attempted to remove my sidearm and emphasized the unpleasant possibilities of what might have ensued had that occurred. S/Tompkins replied by saying 'Oh, dude. That *is* fucked up' or words to that effect. I then informed S/Tompkins about the web posting I had discovered pursuant to my conversation with C/Rood. S/Tompkins acknowledge that he was aware of the posting, but stated that he did not write it.

During post Miranda questioning of S/Erwin, S/Erwin initially denied any knowledge or membership to the Anarchists, but later acknowledged that he did identify himself as one. S/Erwin stated that I 'did not know anything' about the Anarchist movement or what they stood for. During subsequent questioning, S/Erwin provided some details of the Anarchist movement but would not respond to questions relating as to why the group had responded so violently. S/Erwin also made a comment akin to 'The FBI says the Anarchist flag is OK'.

I completed the Incident Report, the Certification for Determination of Probable Cause, required paperwork, and arranged for the suspects to be transported to KCJ. I then completed this statement.

**DEF ID # 8**

WITNESS

WITNESS

(Transcribed or Traced/Translated Statements)

X

| STATEMENT TAKEN BY | | SERIAL | UNIT |
|---|---|---|---|
| M Hyra | | 6620 | 662 |
| | SERIAL | UNIT | SUPERVISOR   SERIAL |

PAGE   3   OF   3

**SEATTLE POLICE DEPARTMENT**

**STATEMENT FORM**

INCIDENT NUMBER
06-422062

UNIT FILE NUMBER
H-06-352

| DATE | TIME | PLACE |
|------|------|-------|
| 10/6/2006 | 1503 | 1519 12 Ave |

STATEMENT OF   ☐ COMPLAINANT   ☐ WITNESS   ☐ VICTIM   ☒ OFFICER   ☐ OTHER

| NAME (LAST FIRST MI) | DOB |
|----------------------|-----|
| M Hyra 6620 | |

### This is a Supplemental Statement Regarding SIN 06-422062

On the date of 10-05-06 at approximately 1300 hrs I was working in uniform, with my partner, Officer Bale, while assigned to routine bike patrol unit 2G82. At this time I was involved in a struggle as previously documented. During this struggle I was attempting to place S/Tompkins into custody for Obstructing and Resisting Arrest and was being assailed by numerous subjects, identified as Anarchists, who were associated with S/Tompkins. As I was attempting to stay on my feet and retain control of S/Tompkins, I felt subjects attempt to remove my handgun from its holster, had several people on both my left and my right attempt to pull me off of S/Tompkins, as well as a group of subjects attempting to remove a metal pole from my hands. I believed that if this pole were removed from my control, it would have been employed as a weapon against me. I was also being assaulted from the rear and subjects were attempting to place their hands and arms into the area of my neck. I was completely surrounded and isolated from other Officers at the scene.

I was aware that I was in grave danger of sustaining great bodily harm by the mob of Anarchists that had surrounded me. Aside from making great efforts to prevent myself from being knocked to the ground, a position of great disadvantage, I also realized that subjects to my rear had access to my neck. I received several contacts and strikes to my head and neck during the event, and believed, due to these contacts, that members of the mob that had surrounded me may be attempting to place an arm around my neck. To prevent this, I moved as close to S/Tompkins as possible, while tucking my head down to my chest and blocking attacks to this area by use of my bike helmet, which, as fortune had it, was still attached to my head. I know, from training and experience, that neck holds, also termed chokeholds or neck restraints, are extremely dangerous. I understood that if a subject were able to firmly place his or her arm about my neck and applied pressure to my airway, I would be at a great tactical disadvantage and, in all likelihood, would lose what little position I had. I would have then had to resort to a dedicated focus on defeating this type of attack, leaving all other defensive measures I was currently employing unattended, thus at the mercy of the violent mob that surrounded me. It is also important to note that types of chokeholds, or neck restraints, are identified as Deadly Force by Departmental guidelines.

After a period of time elapsed, and the struggle continued, responding Officers rendered assistance, as previously documented. One of these Officers was Officer Avery, who removed two subjects who were assaulting me on my left side. These subjects fled into the protest crowd and remain unidentified. I was still being assailed from the right and rear. I then saw more Officers arrive to assist and saw Officer Skommesa place a subject on the ground to my left. After Officer Skommesa detained this subject, later identified as S/Dunn, I ceased being assaulted from the rear and was able to escape with S/Tompkins. The subjects assailing me from the right fled as more Officers came into the area. These subjects also ran into the larger protest crowd and remain unidentified.

I later conferred with Officer Skommesa and he informed me that when he arrived at the scene of the incident, he witnessed S/Dunn assaulting me from the rear and took appropriate action. Due to my position during the struggle, and the fact that I was fending off various attacks from the front and both sides, I was unable to turn and face any attackers to the rear and, as a result, could not visually identify S/Dunn. However, as I was being attacked from the rear and as these attacks ended after Officer Skommesa detained S/Dunn, I believe that S/Dunn was responsible for assaulting me from the rear and that he was clearly able to place his hands or arms in the area about my neck, in the aforementioned described manner, as well as possibly attempting to remove my sidearm from its holster. End of Statement.

| WITNESS | | STATEMENT TAKEN BY | SERIAL | UNIT |
|---------|---|--------------------|--------|------|
| | X | M Hyra | 6620 | 662 |

| WITNESS | | | | |
|---------|---|---|---|---|

| TRANSCRIBED BY (Taped / Translated Statements) | SERIAL | UNIT | SUPERVISOR | SERIAL |
|-----------------------------------------------|--------|------|-----------|--------|

DEF ID 9